## 61792. MARKETING & DISTRIBUTION SERVICES, INC. v. COSVETIC LABORATORIES, INC.

DEEN, Presiding Judge.

The appellant plaintiff (herein referred to as M-D-S) is a brokerage service which entered into a contract with the appellee manufacturer (Cosvetic) to market a suntan preparation known as Tahitian Tan. Various explanations, amendments, or modifications were generated by letter from time to time as will be subsequently discussed. M-D-S eventually filed a complaint charging that Cosvetic was due it $26,463 on account for unpaid marketing fees. Cosvetic denied the complaint and asserted by counterclaim that the plaintiff was due it some amount for overpayments, for which it sought a legal accounting and judgment.

The plaintiff offered two witnesses and various documents on which both sides depended as setting out the contracts between the parties. At the conclusion of its evidence Cosvetic moved for a judgment on its counterclaim for overpayments which was granted by the trial judge in the amount of $92,115.00, and plaintiff appeals.

1. "Where a principal advances money to his agent on a drawing account against his commission to be earned as a salesman for selling merchandise, and his commission does not amount to the sum advanced, the employer can not, in the absence of an express or implied agreement, or promise to repay any excess of advances over the commissions earned, recover such excess from the employee . . ." *Kennesaw Life &c. Ins. Co. v. Hendricks,* 108 Ga. App. 148, 150 (132 SE2d 152) (1963). Where the contract contains an agreement to repay advances in excess of earned commissions, the employer may recover such excess. *Daniels v. Allen,* 118 Ga. App. 722 (1) (165 SE2d 449) (1968).

2. The contract and its various modifications results from a series of letters and written communications. The first, dated March 12, 1976, contains the following language:

"4. Cosvetic to remit monthly a draw against commissions to M-D-S in the amount of $16,000 per month. Cosvetic will be obligated to M-D-S for all commissions and not to any individual sales agents acting as agents of M-D-S and M-D-S will be obligated to Cosvetic to the extent of any excess draw payments against the sales commissions finally earned . . . M-D-S agrees that the $16,000 paid monthly is adequate draw against commissions for complete national account coverage. From the $16,000 monthly draw against commissions, M-D-S will retain $6,000 to be applied against a commission of 2% of the 'net national sales' as defined above. From the remaining $10,000 of the $16,000 monthly draw against

commissions, M-D-S will pay each sales agent their proportionate shares . . . This draw is against a 10% commission rate for the sales agent and will be deducted from the agent's final payment of 10% of net sales less returns." The court correctly construed this paragraph as requiring that the $6,000 draw go direct to M-D-S to be applied against its overall commission of 2% of national sales, and the $10,000 draw be paid over to sales representatives directly against their overall commission of 10% of sales less returns. Further, we hold that, considering the paragraph as a whole, the obligation of M-D-S to refund any draws in excess of commissions ultimately found to be owing applies both to the M-D-S draw and to the individual draws against sales by the representatives.

3. On March 19, 1976, M-D-S wrote Cosvetic a letter to which the president of Cosvetic agreed in writing, stating that the letter is an additional page to the March 19 contract "spelling out the fact that under paragraph 4 M-D-S is retained at 2% of national sales or $6,000 per month, whichever is greater." It appears from these two documents as a whole that the word "retained" refers to the amount of draw and does not nullify the M-D-S obligation to return excess draw payments against commissions finally earned. "Retain" and "draw" are apparently used synonymously, as were the words "subsidy" and "advances" in *Daniels v. Allen,* supra.

4. According to the further testimony of plaintiff's witness, the M-D-S draw was increased from $6,000 to $8,000 when M-D-S took on the additional responsibility of selling a product called Head Start. Paragraph 6 of the March 12, 1976 contract specified that "the agreement can be cancelled at any time by 30 days written notice." On May 6, 1977, Cosvetic by its attorney wrote M-D-S stating that, pursuant to the March 12 agreement, it was giving written notice of cancellation to be effective in 30 days, that is, on June 6, 1977 which letter, however, the M-D-S witness denied that the company ever received.

On June 10, 1977 M-D-S wrote Cosvetic, stating that as discussed in a recent office session an agreement between the parties is set out whereby M-D-S will represent Cosvetic for a 12-month period ending May 31, 1978, "M-D-S to perpetrate [sic] the sale and merchandising of certain [named] Cosvetic Laboratories products; M-D-S to maintain an adequate national sales agency force in addition to its regional managerial staff . . . Cosvetic Laboratories to pay M-D-S a fee of $4,000 per month . . . commencing with the month of June, 1977 for its services. Cosvetic Laboratories to also pay M-D-S at the rate of 10% of net sales derived from M-D-S and its network of brokers. The 10% to be substantiated by invoices from Cosvetic Laboratories. The $4,000 per month paid to M-D-S versus 5% of net

invoices or whichever is greater."

Although the copy of this letter introduced into evidence and signed by the president of M-D-S does not contain an acceptance signature it appears that it was adopted by Cosvetic during the months of June, July, August and September. On October 25, 1977 Cosvetic's president wrote M-D-S stating that "effective immediately, M-D-S will no longer represent Cosvetic. . . ." After further correspondence M-D-S received payments of $1500 in September and $3,000 each in November and December, 1977.

It is clear from the above, applying the rule stated in the first division of this opinion, that the parties acted between March, 1976 and May or June, 1977 under a contract allowing M-D-S for itself other than in payment of representatives a commission of 2% of national sales and that any amount by which the monthly draw exceeded this sum was to be returned to Cosvetic, which of course was also true as to the accounts of individual salesmen when those accounts were made final (a date which might be several months after the sale, depending on returns or winter carry-overs). Whether or not the May 6 letter was received, it is obvious that the parties operated for several months under the June 10 missive which is a new and complete contract in itself, following oral discussions between the parties, obligating Cosvetic to pay M-D-S "a fee of $4,000 per month for its services." This was in fact a new and complete contract, carried out by both parties for a number of months. No question of draw arises under it and there is no obligation to return any part of the draw under any circumstances.

We accordingly conclude that between May, 1976 and May, 1977 any excess in the amount of draw paid M-D-S over the amount earned as a percentage of national sales would be owed by M-D-S to Cosvetic, whereas under the June, 1977 agreement the monthly figure of $4,000 was a flat fee for services regardless of the percentage of national sales.

The case is accordingly reversed and remanded for findings in accordance with what is herein held.

*Judgment reversed. Banke and Carley, JJ., concur.*

Decided May 6, 1981 —
Rehearing denied May 21, 1981

*Stanton J. Shapiro,* for appellant.
*James G. Killough,* for appellee.